# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**THOMAS MCGILL,**                                   Case No. 5:18 CV 1636

     Plaintiff,

     v.                                        Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION,**

     Defendant.                                MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Thomas McGill ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for SSI in July 2015, alleging a disability onset date of May 5, 2015. (Tr. 161-64). His claims were denied initially and upon reconsideration. (Tr. 86-90, 93-100). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 114-15). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on June 7, 2017. (Tr. 53-81). On November 30, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 40-48). The Appeals Council denied Plaintiff's request for review, making the

hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on July 17, 2018. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1963, Plaintiff was 51 years old on his alleged onset date, and 54 years old on the date of the ALJ's decision. *See* Tr. 47, 161. He had a high school education and past work as a car detailer. (Tr. 57).

Plaintiff shattered his right ankle in May 2015 after falling from a ladder while helping a friend paint a house. (Tr. 59-60, 689). He had no other medical problems. (Tr. 60). Since the injury, Plaintiff experienced "a lot of nerve damage . . . [and] pain"; he had days where his foot "lock[ed] up". (Tr. 61). He did not drive due to his foot "lock[ing] up". (Tr. 69-70). Plaintiff could not bend his foot forwards or backwards and could not curl his foot or bend his toes. (Tr. 61).

Plaintiff's noted his ankle pain was "constant]" (Tr. 61), was worsened by being on the foot (Tr. 62), and eased by lying down and elevating it (Tr. 61). Plaintiff had foot pain while seated during the hearing, describing the feeling as "real tight". (Tr. 62). He stated he elevated his foot "most of the time", estimating he spent six to eight hours a day lying with it elevated. (Tr. 65).

Plaintiff estimated he could stand for approximately five minutes before needing to sit down, and could only sit for "a few minutes" before needing to stand and move his foot. (Tr. 62-63). He used a cane "as often as needed", which was "most of the time". (Tr. 63-64). Plaintiff stated the cane was prescribed by Metro Hospital Physical Therapy and providers instructed him how to use it. (Tr. 68-69). Plaintiff stated he did not bring it to the hearing because his ride was late; he "hobbled out the door" and did not realize he had forgotten it until later. (Tr. 64). Plaintiff also purchased and wore a brace on his right ankle. (Tr. 63).

Plaintiff took over-the-counter anti-inflammatories and vitamins to ease his pain; he did not take any prescription medication. (Tr. 65-66). He tried injections and physical therapy in the past with no relief. (Tr. 66). Plaintiff further testified that he was not undergoing any treatments at the time of the hearing; when asked why not, Plaintiff stated "I can't really say. I don't know". (Tr. 65).

<u>Relevant Medical Records</u>

On May 29, 2015, Plaintiff fell five feet from a ladder onto his right foot. (Tr. 278). He was seen at the emergency room immediately following; orthopedic specialists diagnosed a pilon fracture with decreased sensation through the medial aspect of his right foot. *Id.* The following day, Evan Dougherty, M.D., performed an open reduction and internal fixation procedure and placed an external fixation device. (Tr. 281-82).

On June 2, 2015, Plaintiff fell at home (while using a walker) and returned to the emergency room. (Tr. 273-74). Six days later, Roger Wilber M.D., performed another open reduction, adjusting Plaintiff's internal and external fixators. (Tr. 229-30). Dr. Wilber noted potential cellulitis around the pin sites and prescribed antibiotics. (Tr. 230). On June 12, 2015, Dr. Wilber surgically adjusted the external fixator and irrigated a small infected abscess on Plaintiff's tibia. (Tr. 242). Dr. Wilber ordered Plaintiff to engage in "limited" weightbearing and ordered he remain on antibiotics until the infection resolved. *Id.* Three days later, James Learned, M.D., performed an open reduction, internal fixation, a proximal tibial autograft, and removal of the external fixator. (Tr. 551-52). Plaintiff was discharged from the hospital on June 19, 2015 and limited to "no weightbearing" on his right leg. (Tr. 238).

In July 2015, Plaintiff followed-up with orthopedist Ryan Li, M.D. (Tr. 375); *see also* Tr. 216-17. Dr. Li noted Plaintiff was "doing well" with his pain "well controlled". (Tr. 375). He

placed Plaintiff on a twelve-week non-weightbearing restriction. *Id*. In August 2015, Plaintiff saw orthopedist Jason Ho, M.D., who found Plaintiff was developing "CRPS ["complex regional pain syndrome"]-type" symptoms in his distal foot. (Tr. 366). X-rays taken during the visit showed healing of the right pilon fracture, osteopenia, and intact hardware. (Tr. 367).

Plaintiff treated at the emergency room in October 2015. (Tr. 603). He complained of worsening "throbbing" pain in his right ankle. *Id*. Plaintiff lived at a homeless shelter and was "unable to perform his recommended care". *Id*. Ibuprofen did not provide relief, and he had been out of his Percocet prescription for "awhile". *Id*. On examination, Plaintiff had diffuse right ankle tenderness with intact ankle dorsiflexion and plantar flexion. (Tr. 604). The provider refilled the Percocet prescription. (Tr. 605). Two days later, Plaintiff treated with Leigh-Anne Tu, M.D., at the orthopedic clinic where he reported continued pain in his ankle with an inability to bear weight on the bottom of the foot. (Tr. 399). On examination, Plaintiff's foot was "extremely sensitive" to light touch and he had limited range of motion in the ankle. *Id*. Dr. Tu found Plaintiff had "CRPS-type" symptoms in his right foot. *Id*. He could bear weight as tolerated in a boot. *Id*. X-rays taken during the visit revealed "severe" osteopenia ("probably related to disuse") and healed fractures with intact hardware. (Tr. 607); *see also* Tr. 399.

 In November 2015, Plaintiff treated with Yazid Hussein, D.O., at an internal medicine clinic. (Tr. 866-68). He reported the chronic pain in his right ankle was "improving", but he had developed pain in his left lower extremity, possibly due to placing more weight on it to avoid using his right foot. (Tr. 867). Plaintiff noted the pain was "mildly" better with Tylenol and he used Percocet in the evenings "sporadically". *Id*. On examination, Dr. Hussein found Plaintiff had a healed fracture with his right foot in a splint; he had a limited range of motion due to pain. (Tr. 868). Dr. Hussein diagnosed right ankle pain and referred Plaintiff to physical therapy. (Tr. 869).

At an orthopedic follow-up later in November 2015, Plaintiff complained of "CRPS-type" symptoms and difficulty weightbearing on his right foot. (Tr. 665-67). Plaintiff "adamantly state[d] he [was] not a narcotic seeker but endorse[d] pain which is not controlled with NSAIDs and that he need[ed] 'something else'". (Tr. 666). No narcotics were prescribed. *Id.*

Plaintiff attended a physical therapy visit in mid-November 2015 with Rachel Lynn Fields, P.T. (Tr. 661-64). Plaintiff reported "constant" 10/10 pain in his right ankle (anterior and medial). (Tr. 662). He used a walking boot and two-wheeled walker. *Id.* Ms. Fields listed Plaintiff's goals as "improve walking, walk in regular shoe, return to working so he can live in his own apt." (Tr. 663). On examination, Plaintiff had intact sensation with mild swelling and a healed incision. *Id.* Plaintiff had an antalgic gait at an "extremely slow speed". *Id.* Ms. Fields found Plaintiff had a "significantly limited" range of motion, strength and flexibility. (Tr. 664). Plaintiff's prognosis was "fair". *Id.* Plaintiff presented to the internal medicine clinic a few days later with complaints of right ankle pain. (Tr. 776). Plaintiff arrived using a walker and described 8/10 pain with difficulty ambulating. *Id.* He did not have relief with ibuprofen or gabapentin. *Id.* The provider increased Plaintiff's gabapentin dose, prescribed naproxen, and recommended he continue with physical therapy. (Tr. 779).

In January 2016, Plaintiff reported to the emergency room for bilateral lower back pain he suspected resulted from moving a chair four days prior. (Tr. 895). On examination, Plaintiff had full range of motion in all extremities and no joint pain. (Tr. 896). He was found to ambulate without assistance and had a steady gait. (Tr. 901). Providers diagnosed low back pain (without sciatica) and prescribed naproxen. (Tr. 898).

Plaintiff treated at an urgent care center in February 2016, reporting right ankle pain. (Tr. 845-46). Providers assessed chronic right foot pain status post-fracture with an extensive repair

and unchanged swelling. (Tr. 846). Plaintiff reported improved erythema and there was no evidence of acute infection. *Id.* Plaintiff was instructed to follow-up with his primary care provider. *Id.* At an orthopedic clinic visit that same month, Plaintiff reported "persistent and severe leg and ankle pain. . . associated with swelling." (Tr. 843). He was able to ambulate "only in boot secondary to pain". *Id.* Christopher Collier, M.D., noted Plaintiff could wean out of his boot and weight bear as tolerated. (Tr. 844). Dr. Collier noted Plaintiff's "[c]hronic pain may be secondary to CRPS or extent of initial injury". *Id.* Dr. Learned co-signed this treatment note. *Id.*

Plaintiff also attended a pain management evaluation in February 2016. (Tr. 836). He reported 10/10 pain in his right ankle. (Tr. 837). Plaintiff reported he could stand for one hour, walk for one hour, and his sitting was "unremarkable". *Id.* Examination revealed joint pain, decreased range of motion, swelling, and tenderness in his right ankle. (Tr. 838-39). At a rheumatology visit that month, a provider found Plaintiff had full range of motion in his ankles without swelling or erythema. (Tr. 827). Plaintiff had a stable gait with his walking boot. *Id.* A few days later, Plaintiff underwent a lumbar sympathetic block with Kutaiba Tabbaa, M.D., based on a diagnosis of CRPS. (Tr. 822). At a March 2016 visit with Dr. Tabbaa, Plaintiff reported "constant, . . . burning" pain. (Tr. 817). Dr. Tabbaa found Plaintiff had a normal gait and normal range of motion on examination. (Tr. 818). Dr. Tabbaa diagnosed CRPS (type one) and recommended regular exercise and aquatic therapy. *Id.*

In April 2016, Dr. Hussein noted Plaintiff's foot was tender to palpation and there was a limited range of motion due to pain. (Tr. 809). Dr. Hussein recommended Plaintiff continue physical therapy and pain management, and referred Plaintiff to podiatry for orthotics. *Id.*

In June 2016, Plaintiff treated with Gina Vitale-Amos, C.N.P., for swelling in his right foot. (Tr. 937). On examination, she found swelling and edema in Plaintiff's right foot and ankle.

(Tr. 938). He had moderate to severe pain in his foot "to the slightest touch", decreased range of motion, and intact sensation. *Id*. Ms. Vitale-Amos assessed right ankle osteomyelitis and referred Plaintiff to a podiatrist. *Id*.

Plaintiff treated with a podiatrist in June 2016. (Tr. 804-06). He presented "ambulating in work boots with a limp". (Tr. 805). On examination, he exhibited normal sensation and coordination with no instability in his right tibia. *Id*. Similarly, Plaintiff exhibited normal sensation and coordination with no instability in his right foot. (Tr. 806). The podiatrist further noted Plaintiff was "exquisitely tender to palpation of entire right foot and ankle" with "pain to palpation of dorsal right midfoot, distal tibia, and distal fibula"; she stated that the pain seemed out of proportion to the pressure applied. *Id*. X-rays taken during the visit revealed decreased bone density and "possible complex regional pain syndrome." *Id*. The podiatrist assessed chronic pain of the right ankle and CRPS. *Id*.

Later that month, Plaintiff reported continued pain and swelling in his right ankle to Ms. Vitale-Amos. (Tr. 935). A Norco prescription helped "some", but he did not take it every day and took Motrin "as needed if pain [was] bad". *Id*. Ms. Vitale-Amos noted trace edema on the right ankle with normal motor strength in the lower extremities and assessed a right ankle injury and osteopenia. (Tr. 935-36). Ms. Vitale-Amos prescribed diclofenac potassium tablets, vitamins, and recommended Plaintiff elevate his ankle and wear compression stockings. (Tr. 936).

Plaintiff returned to Ms. Vitale-Amos in October 2016 for a general wellness exam. (Tr. 933). She found Plaintiff had normal motor strength and sensation on examination and recommended physical therapy. *Id*. At a visit later that month, Plaintiff requested a physical therapy referral and medication for ankle pain. (Tr. 931). Ms. Vitale-Amos assessed right ankle and joint pain, other chronic pain, and a right ankle injury (subsequent encounter). *Id*. She

recommended Plaintiff follow-up with his pain management clinic and provided him with a physical therapy referral. (Tr. 931-32).

Opinion Evidence

*Treating Physician*

Dr. Learned completed a Medical Source Statement in December 2015. (Tr. 781-82). Dr. Learned opined Plaintiff's lifting/carrying abilities were affected by his impairment, but left blank the question which asked him to opine how many pounds Plaintiff could lift/carry occasionally or frequently. (Tr. 781). He opined Plaintiff's standing/walking abilities were affected by his impairment and limited Plaintiff to two to three hours of standing/walking (total) in an eight-hour workday, and less than one hour without interruption. *Id*. Dr. Learned opined Plaintiff's ability to sit was not affected. *Id*. Plaintiff could rarely climb, balance, stoop, crouch, kneel, and crawl. *Id*. He found Plaintiff could occasionally reach, push or pull, and frequently engage in gross and fine manipulation. (Tr. 782). Dr. Learned left blank the question which asked him what medical findings supported this conclusion. *Id*. He opined Plaintiff should avoid heights, moving machinery, and temperature extremes. *Id*. Dr. Learned noted Plaintiff had been prescribed a cane and walker, and he needed to be able to alternate positions between sitting, standing, and walking at will. *Id*. He found Plaintiff had moderate pain which interfered with his ability to concentrate and took him off-task. *Id*. Finally, Dr. Learned opined Plaintiff needed to be able to elevate his legs "above [the] heart" at will. *Id*. When asked to describe the medical findings which supported each of assessments here, Dr. Learned wrote "pilon fracture" with no further explanation. (Tr. 781-82).

*State Agency Physicians*

In August 2015, State agency physician Stephen Sutherland, M.D., examined Plaintiff's medical records and determined "the medical evidence does show that [he] suffered an ankle fracture [which] required corrective surgery." (Tr. 90). However, Dr. Sutherland found disability could not be established because Plaintiff's condition was expected to be "sufficiently healed within a year" of the injury. *Id*.

In December 2015, State agency physician Lynne Torello, M.D., offered a projected RFC for May 2016 (twelve months after onset). (Tr. 97-99). She found Plaintiff could lift/carry twenty pounds occasionally and ten pounds frequently. (Tr. 97). He could stand and/or walk for approximately six hours in an eight-hour workday. *Id*. She found Plaintiff unlimited in his ability to push and/or pull "other than shown, for lift and/or carry". (Tr. 98). Dr. Torello opined Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; he could occasionally crouch or crawl. *Id*. Plaintiff could also frequently balance, and was unlimited in his ability to kneel or stoop. *Id*.

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 72-79. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was limited in the way in which the ALJ determined Plaintiff to be. (Tr. 73). The VE opined such an individual could perform jobs such as a cashier, fast food worker, or a housekeeper. *Id*.

The ALJ posed an additional hypothetical adding the use of a cane for walking. *Id*. The VE opined such an individual could not perform the jobs listed above, but could perform jobs such as a food and beverage order clerk, bench assembler, or a charge account clerk. (Tr. 74). These are listed as unskilled, sedentary jobs. *Id*.; *see also* Food & Beverage Order Clerk, *Dictionary of*

*Occupational Titles* ("*DOT*"), 209.567-014, 1991 WL 671794 (4th ed. 1991); Charge Account Clerk, *DOT*, 205.367-014, 1991 WL 671715; Bench Assembler, *DOT*, 713.687-018, 1991 WL 679271.

ALJ Decision

In a written decision dated November 30, 2017, the ALJ found Plaintiff had not engaged in substantial gainful activity since his application date (July 10, 2015). (Tr. 42). She concluded Plaintiff had the severe impairment of a fracture in his right lower extremity, *id.,* and this impairment did not meet (or medically equal) the severity of a listed impairment (Tr. 44). The ALJ then set forth Plaintiff's residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except with the following additional limitations. The claimant can occasionally crouch, crawl, and climb ramps and stairs; frequently balance; and never climb ladders, ropes, or scaffolds.

*Id*. The ALJ found Plaintiff had no past relevant work; was defined as a "an individual closely approaching advanced age" on the application date; and had a high school education. (Tr. 47). The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform jobs that existed in significant numbers in the national economy. *Id*. Thus, the ALJ found Plaintiff had not been under a disability since his application date. (Tr. 48).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &*

*Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ erred in three ways: (1) in her evaluation of Dr. Learned's opinion; (2) in not finding Plaintiff's CRPS a "severe" impairment; and (3) in finding Plaintiff's use of a cane not medically necessary. (Doc. 14, at 12-21). The undersigned addresses each of these arguments in turn and ultimately finds the ALJ's decision supported by substantial evidence.

Treating Physician

Plaintiff first argues the ALJ erred in assigning only "some" weight to Dr. Learned's opinion, specifically asserting that none of her reasons for doing so "hold water". (Doc. 14, at 14, 16). For the following reasons, the undersigned finds no error in the ALJ's analysis, and affirms her decision in this regard.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians.[1] *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and

---

1. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2))

A treating physician's opinion is given "controlling weight" if it is supported by: (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Importantly, when the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Id.* (quoting 20 C.F.R. § 416.927(d)(2)). These reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544 (quoting SSR 96-2p, 1996 WL 374188, at *5). When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, she is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

In evaluating Dr. Learned's opinion, the ALJ explained:

Some weight is given to the medical source statement of James Learned, M.D., from December 15, 2015. He opined that due to the claimant's fracture, his ability to lift, carry, stand, walk, perform postural activities, concentrate, and stay on task is affected. He also opined that the claimant would have

environmental restrictions of heights, moving machinery, and temperature extremes and would need to elevate his legs at will above his heart (Exhibit 7F). Although Dr. Learned is a treating source this opinion is not given great weight. This is because he does not support his opinion with any objective findings besides mentioning multiple times that the claimant has a pilon fracture. He also does not state how much the claimant could lift and carry, just that he is limited. It is additionally noted that this opinion was given while the claimant's fractures were still healing and less than a year after the claimant's injury. Furthermore, Dr. Learned does not indicate for what period these restrictions would apply to or if the claimant's impairment was expected to improve. Therefore, the undersigned only gives some weight to this assessment.

(Tr. 46).

Here, the ALJ gave several "good reasons" why she assigned less than controlling weight to Dr. Learned's opinion. First, she concluded Dr. Learned's opinion was unsupported by any objective findings, noting that he only broadly stated Plaintiff had a "pilon fracture". *Id*. Plaintiff argues this diagnosis *is* an objective finding, confirmed by x-rays. (Doc. 14, at 15). However, as the ALJ correctly points out, Dr. Learned did not support the specific restrictions in his opinion with any objective findings – he merely listed a diagnosis. *See* Tr. 781-82. Further, Dr. Learned left some questions blank and did not indicate for which time period these restrictions would apply. *Id*. Many courts, including the Sixth Circuit, have found it proper for an ALJ to discount such a "check box" style form where she finds it conclusory, brief, or unsupported by the record as a whole. *See, e.g., Hernandez v. Comm'r of Soc. Sec.,* 644 F. App'x 468, 474 (6th Cir. 2016) (upholding the ALJ's discounting of a treating physician's check box form where it was unaccompanied by any explanation, specifically, whether the limitations applied to Plaintiff when she was on, or off, her medications); *Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 176 (6th Cir. 2009) ("Because [the treating physician] failed to identify objective medical findings to support his opinion [on a questionnaire] regarding [the claimant's] impairments, the ALJ did not err in discounting his opinion."); *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir.

2004) (upholding the ALJ's discounting of a treating physician's check list form where it was unsupported by objective evidence, contradicted by other evidence, and based primarily on subjective descriptions of pain); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3rd Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). Moreover, this discussion implicates supportability, a factor to be considered in evaluating opinion evidence under the regulations, *see* 20 C.F.R. § 416.927(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."), and is a "good reason" an ALJ may give to assign less than controlling weight, *Rabbers*, 582 F.3d at 660.

Plaintiff further argues the ALJ's assessment is "suspect" because she relied on the fact that Dr. Learned did not specify how much Plaintiff could lift or carry and such a restriction is not relevant to his walking/standing abilities. (Doc. 14, at 15). The ALJ did rely, in part, on the fact that Dr. Learned left blank the question regarding Plaintiff's lifting/carrying abilities, as one reason for discounting his opinion. (Tr. 46). As discussed thoroughly above, an ALJ is certainly within her authority to discount an opinion she finds incomplete, unsupported, or vague. However, even if this single reason were eliminated from the ALJ's rationale altogether, her opinion still provides more than enough in the way of "good reasons" for discounting Dr. Learned's opinion

Plaintiff further argues that it is reversible error for the ALJ to give greater weight to a non-examining State physician over that of a treating source, citing *Blakely v. Commissioner of Social Security*, 581 F.3d 399 (6th Cir. 2009), in support. (Doc. 14, at 15-16). *Blakely* is distinguishable for several reasons. Most relevant, to fit the error Plaintiff alleges, *Blakely* requires three things: (1) the ALJ must fail to give "good reasons" to accord less than controlling weight to the treating source; (2) the State agency physicians must have issued their opinions without having the

opportunity to review subsequent, relevant, treatment records; *and* (3) there must be no indication the ALJ considered the subsequent treatment notes. *Id*. at 409-10. Here, as noted above, and unlike *Blakely*, the ALJ provided accurate and well-articulated "good reasons" to assign less than controlling weight to Dr. Learned's opinion. The State agency physicians issued their opinions in August and December 2015 (Tr. 90, 97-99), meaning Plaintiff's 2016 treatment history was not reviewed by these sources. But, the ALJ's opinion contains a thorough and accurate recounting of Plaintiff's 2016 appointments and treatments – indicating she did, in fact, consider them. *See* Tr. 45-46. The undersigned further notes that, absent the circumstances listed above, the Sixth Circuit made clear in *Blakely* that "the ALJ's decision to accord greater weight to state agency physicians over Blakely's treating sources was not, by itself, reversible error". *Blakely*, 581 F.3d at 409. This proposition is also supported by the regulations. *See* SSR 96-9p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."). Here, the ALJ assigned "great weight" to State agency consultant Dr. Torello because her assessment was "generally consistent with and supported by the medical evidence of record as a whole", including "objective findings from the record". (Tr. 46). The ALJ's assessment is supported and, for the foregoing reasons, there is no error in her decision to assign lesser weight to Dr. Learned's opinion.

For these reasons, the undersigned finds the ALJ provided the required "good reasons" for assigning Dr. Learned less than controlling weight, and her reasons are supported by substantial evidence. Her decision is affirmed in this regard.

Consideration of CRPS

Plaintiff next argues the ALJ erred at Step Two because she did not find CRPS to be a severe impairment, and further erred when she did not consider it later in her opinion. (Doc. 14, at 16). The undersigned finds no error here and affirms.

At Step Two of the disability analysis, the ALJ determines whether a claimant has a medically determinable impairment (or a combination of impairments), that is "severe". 20 C.F.R. § 416.924(a). By definition, a "severe" impairment is one that "significantly limit[s] your physical or mental ability to do basic work activities". 20 C.F.R. § 416.922(a). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009) (quoting SSR 96-8p, 1996 WL 374184, at *5) (emphasis added). In other words, if a claimant has at least one severe impairment, the ALJ must continue the disability evaluation and consider *all* of the limitations caused by the claimant's impairments – severe and not. When an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments does not constitute reversible error. *Id.* at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

Here, the ALJ found Plaintiff only had one severe impairment, which the she identified as a "fracture[] of the right lower extremity". (Tr. 42). Because she found a severe impairment, the ALJ was required to "consider limitations and restrictions imposed" by Plaintiff's non-severe impairments beyond Step Two – including his CRPS. SSR 96-8p, 1996 WL 374184, at *5. Plaintiff argues the ALJ erred by "not addressing this medical condition" and her decision "never so much as mentions the diagnosis of CRPS". (Doc. 14, at 16-17).

Though the ALJ did not discuss the diagnosis by name, it is clear by her analysis that she considered Plaintiff's CRPS diagnosis throughout her decision as it directly relates to his ongoing pain struggles following the fracture. *See* Tr. 45-46 (recitation of Plaintiff's treatment history including pain complaints). However, in considering Plaintiff's subjective pain symptoms, she ultimately concluded "[t]he medical evidence only partially supports the claimant's subjective allegations." (Tr. 45). This finding is supported by substantial evidence. For example, the ALJ notes that, at a follow-up appointment after his last surgery, Plaintiff reported "doing well, having his pain controlled, and was not experiencing any new numbness or tingling." (Tr. 45) (citing Tr. 216-17). The ALJ cited similar improvements in treatment notes from subsequent visits. *Id.* (citing Tr. 368 (Plaintiff "doing well" at August 2015 visit); Tr. 839 (Plaintiff may wean out of his walking boot as tolerated in February 2016); Tr. 805 (June 2016 visit where Plaintiff ambulated in work boots with a limp); Tr. 933 (October 2016 visit revealing normal motor strength and intact sensation)). The ALJ also cited several objective findings indicating "the claimant's fractures have been stated to have healed well." (Tr. 46) (citing Tr. 381, 407, 844, 914, 935). Further, the ALJ found that "[a]fter the claimant's initial treatment after his injury, he has not generally received the type of medical treatment one would expect for a totally disabled individual", specifically noting "the claimant testified that he was currently not receiving any treatment for his impairment and did not give a reason as to why he was not." (Tr. 46). Indeed, when asked why he was not receiving treatments, Plaintiff replied "I can't really say. I don't know." (Tr. 65). Plaintiff also noted his medication regimen only consisted of over-the-counter anti-inflammatories and vitamins. *Id.* Additionally, the ALJ noted there is no indication Plaintiff followed through with subsequent physical therapy visits (following his first), even after encouragement from providers. (Tr. 46) (citing Tr. 779, 818, 809, 931). As the Sixth Circuit, this, and other courts have found, an

ALJ does not err when she considers such a conservative treatment history when assessing Plaintiff's credibility. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x, 719, 727 (6th Cir. 2013) (minimal treatment or lack of treatment is valid reason to discount severity and credibility); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."); *McKenzie v Comm'r of Soc. Sec.*, 2000 WL 687680, at *4 (6th Cir.) (Plaintiff's non-aggressive treatment undermined complaints of disabling pain); *Pinson v. Comm'r of Soc. Sec.*, 2019 WL 969484, at *7 (N.D. Ohio) (same).

Moreover, it is evident within the RFC that the ALJ considered Plaintiff's fracture and the pain associated with it. In so considering, she limited him to "light work" with the added restrictions of occasional crouching, crawling, and climbing of ramps and stairs, and no climbing of ladders, ropes, or scaffolds. (Tr. 44).

The undersigned finds the ALJ's reasons here are supported by substantial evidence and finds no error in her consideration of the limitations and restrictions caused by Plaintiff's CRPS.

Cane Use

Finally, Plaintiff argues the ALJ erred in finding his use of a cane was not medically necessary and subsequently erred in not including it in the RFC. (Doc. 14, at 18-20). For the following reasons, the undersigned finds no error in the ALJ's conclusion and affirms.

According to the Sixth Circuit, if a "cane [is] not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). For an ALJ to find a hand-held assistive device is "medically required", "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it

is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7. Although the Sixth Circuit has not directly ruled on this issue, other circuit courts have noted the key finding in cases involving assistive devices is documentation "describing the circumstances for which [the assistive device] is needed." *Id.*; *see Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012) (noting that a finding of medical necessity of an assistive device requires a statement of the circumstances in which it is needed and that other circuits "have required an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary"); *Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) (prescription for a cane from the Veteran's Administration insufficient to show medical necessity); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (prescription and references that claimant used a cane insufficient to show medical necessity).

Courts within the Sixth Circuit have found that lacking such a statement, an ALJ is not required to incorporate the use of an assistive device in the RFC. *See Halama v. Comm'r of Soc. Sec.*, 2013 WL 478966, at *8 (N.D. Ohio) ("[E]ven Halama does not contend that the record contains the unambiguous statement of a physician containing the circumstances under which it would be medically necessary for him to use a cane. Inasmuch as there is no such statement in the record, I find that the decision of the ALJ in this case not to incorporate the use of a cane into the RFC is supported by substantial evidence.") (internal quotation omitted); *see also Salem v. Colvin*, 2015 WL 12732456, at *4 (E.D. Mich.) ("Neither the cane prescription nor treatment records . . . indicate the circumstances in which Salem might require the use of a cane. As such, Salem's argument that the need for a cane might erode the occupational base of sedentary work is without support.") (transcript citation omitted); *Mitchell v. Comm'r of Soc. Sec.*, 2014 WL 3738270, at *13

(N.D. Ohio) ("As there is no medical documentation establishing that Mitchell required the use of a cane and describing the circumstances when it is needed, the ALJ did not err by omitting the use of a cane from his hypothetical questions to the vocational expert.").

The ALJ expressly addressed the cane and concluded it was not medically necessary:

> Furthermore, although he testified that he uses a cane as needed, the medical evidence does not establish that the cane is necessary to ambulate and the claimant testified that he had forgotten to bring it with him to the hearing, which suggests that he does not use the cane at all times.

(Tr. 46).

Here, the ALJ concluded the medical evidence of record did not establish the cane was "necessary to ambulate". *Id*. This conclusion is supported by substantial evidence. First, to reiterate, "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, *and describing the circumstances for which it is needed*[.]" SSR 96-9p, 1996 WL 374185, at *7 (emphasis added). In support of his position, Plaintiff relies only upon Dr. Learned's December 2015 opinion as proof the cane was prescribed. (Doc. 14, at 18) (citing Tr. 781). However, Dr. Learned's opinion only contains a check box indicating the cane was prescribed and does not indicate if he, or another provider, prescribed it, nor does it indicate specific circumstances for which it is needed, as required under the regulations. *See* Tr. 781. Plaintiff further cites his own testimony that a physical therapist gave him the cane and showed him how to use it. (Doc. 14, at 19) (citing Tr. 68-69). However, Plaintiff does not point to any physical therapy records to verify this statement. Plaintiff also indicates that "numerous providers noted Plaintiff's use of a cane throughout the period under consideration" but again does not point to any specific records. *Id*. at 18. The undersigned notes that, even if records demonstrated Plaintiff arrived at some appointments using a cane, this still would not prove that a provider found the instrument *necessary*, nor indicate the *circumstances* in which he needed to use it. Finally, the ALJ

accurately points out that, though Plaintiff testified he used a cane "as often as needed. . . most of the time", Plaintiff did not bring the cane to his disability hearing. (Tr. 46) (citing Tr. 64). Here, because Plaintiff does not point to a prescription, or statement from a provider indicating the circumstances in which it is necessary, there is no evidence to support the cane was medically necessary and the ALJ did not err at arriving at this conclusion. *See* SSR 96-9p, 1996 WL 374185, at *7; *see also Halama,* 2013 WL 478966, at *8; *Mitchell*, 2014 WL 3738270, at *13. And, as noted, if a "cane [is] not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon*, 51 F. App'x at 575. Thus, the ALJ also did not err in failing to include a cane within her RFC.

For the foregoing reasons, the undersigned finds the ALJ's analysis regarding Plaintiff's cane usage supported by substantial evidence and affirms her decision in this regard.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and affirms that decision.

 s/ James R. Knepp II
United States Magistrate Judge